[Civ. No. 2254.    Fourth Appellate District.—August 17, 1939.]

JOE S. ANGELO, Respondent, v. HENRY ESAU et al., Appellants.

Ray W. Hays for Appellant Esau.

No appearance for Appellant Bragg.

Irvine P. Aten and Richard V. Aten for Respondent.

HAINES, J., *pro tem.*—This case presents the familiar picture of injuries resulting from the collision of motor vehicles within the intersection of two highways which cross each other at right angles. The accident occurred northwest of the city of Fresno in the county of that name. Madera Avenue is a paved "through highway" running north and south. McKinley Avenue is an oiled road which crosses it from east to west. The pavement of Madera Avenue is 16 feet wide, and there is a white median traffic line along the center of it. Outside this pavement are graded shoulders on either side. These are oiled for part of the way between the pavement and their outside edges. At the point of intersection between Madera and McKinley Avenues the combined width of oiled surface and pavement upon the former amounts to 60 feet. The oiled portions of the shoulder taper off, however, to the north so that on the west side of the paved strip the oiled area has narrowed to 6 feet at a point 50 feet north of the center line of the intersecting McKinley Avenue and to 4 feet at a point 100 feet from that line, while on the east side of the pavement such oiled surface has, at a point 50 feet north of the said center line of McKinley Avenue, already narrowed to 4 feet. From these respective points the

oiled parts of the shoulders continue at such width of 4 feet, on north. The oiled surface of McKinley Avenue is 17 feet wide at a distance of 80 feet east from the center line of Madera Avenue and outside of this oiled strip is a graded shoulder on either side. This is 6 feet wide at the north and 8 feet wide at the south. This oiled surface of McKinley Avenue, however, as it nears Madera Avenue, widens to 30 feet at the intersection, and the flanking dirt shoulder is there entirely overspread. These conditions on Madera Avenue south of its intersection with McKinley Avenue correspond generally to those on Madera Avenue north of such intersection. So likewise do these conditions on McKinley Avenue west of its intersection with Madera Avenue correspond generally with those on McKinley Avenue east of that intersection. There is a stop-sign at the north edge of the graded north shoulder of McKinley Avenue 30 feet east of the east line of pavement of Madera Avenue and a sign-post just south of the graded south shoulder of McKinley Avenue 30 feet west of the west line of the pavement of Madera Avenue. Both stop-signs are visible to a driver proceeding westerly on McKinley Avenue for the last several hundred feet of his approach to Madera Avenue, and the one on the west side of Madera Avenue is visible to a driver coming southward on the west side of Madera Avenue for several hundred feet before the intersection is reached. The areas to the northwest and to the northeast of the intersection are occupied by vineyards. On the northwest corner and perhaps also at the northeast corner the vines reach a height of several feet. The rows of vines in these two vineyards run east and west and the southernmost row in each of them is 20 feet north of the center line of McKinley Avenue and the one to the west approaches to within 35 feet of the center line of Madera Avenue. On the east the vineyard rows approach within 20 feet of the east line of the Madera Avenue pavement.

Defendant and appellant Bragg operates stores both at Fresno and at Fowler, California, under the name ''Bragg's Home Appliance Shop'' and, at the time of the accident, plaintiff and respondent Joe S. Angelo and defendant N. L. Pimental were both in his employ and, while acting within the scope of their employment, had come from Fowler, stopped at Fresno and were proceeding westerly along McKinley Avenue in a Dodge ''pickup'' car owned by Bragg but being

driven by Pimental. The Dodge car while so proceeding, after it had reached the easterly line of Madera Avenue, and while it was engaged in crossing the same, was struck pretty squarely at right angles on the cab and right-hand side by a Chevrolet sedan, then being driven southerly along the right lane of Madera Avenue by defendant and appellant Henry Esau. The collision resulted in personal injuries to respondent Angelo for which he obtained in the trial court a verdict for $8,500 damages against the defendants. Judgment having been entered on the verdict and motions for new trial interposed by both Esau and Bragg having been denied, each of these defendants has appealed. There is no appeal on Pimental's behalf. Counsel for appellant Bragg has filed no brief in support of his appeal, so we shall assume that it has been abandoned.

We proceed, therefore, to examine the contentions made on behalf of appellant Esau. His claims are, first, that the evidence demonstrated as a matter of law that he was not guilty of negligence; and, second, that the court committed various errors in its instructions to the jury.

The Dodge "pickup" was a vehicle with a closed cab and an open body behind the cab which is about 4 feet wide and 6 feet long. There is a guard about the rear body about 12 inches high. This car, according to Pimental's testimony, was at the time of the accident three months and two weeks old and he had, during that time, been driving it. He said that with new cars the shifting of gears is apt to be difficult. Referring to the stop-sign north of McKinley Avenue and east of the intersection he testified that he first learned that it was there on the day of the wreck but he is unable to say, whether he learned of its presence before or after the wreck occurred. Asked how fast he had been operating on McKinley Avenue he said "Oh, I have no idea but apparently around 40 or 45." At another point he said that his speed could have been "anything from 35 up to 45". Elsewhere, when asked how fast he was traveling from the time he turned on to McKinley Avenue and proceeded west he said: "well, I have no recollection of the speed I was traveling at". He had been traveling on McKinley Avenue in high gear. He remembers making no change in gear until he approached Madera Avenue when he changed from high into low. Then just as he was "approaching the highway on Madera Avenue"

he testified to changing from low gear into second. He does not remember stopping at the stop-sign. He says that he first saw Esau's car when the front wheels of his own were on the paved part of Madera Avenue. He says that he was then traveling about 15 miles per hour. He had slowed down for the intersection "but whether I made the stop or not I won't swear to it". Elsewhere he says that he "might" have come to a complete stop. This might have been at the stop-sign. He was engaged at the time he saw Esau's car "in shifting from low trying to get from low into second". His clutch was out. He does not know whether he ever completed the movement or not. He testified that the vineyards to his right and north kept him from seeing Esau's car until he himself got clear into the intersection. The corner, according to him was "blind clear up to the intersection". On seeing Esau's car "I tried to get mine into gear to see if I could get out of his way". Esau's car, he says, was, when he first saw it, 100 or 125 feet away. He cannot tell how fast he was coming. He doesn't think Esau slackened his speed. When the cars were only 40 to 50 feet apart he noticed that Esau was glancing off to his right. "He wasn't even looking our way." The respondent Angelo was sitting at Pimental's right as they rode west on McKinley Avenue. He was along for the purpose of helping Pimental with some of Mr. Bragg's refrigerator work. He had nothing to do with the driving. He testified that they were traveling on McKinley Avenue at from 40 to 50 miles per hour. He didn't see Esau's car at all. He doesn't know whether Pimental slowed his car before entering the intersection or not. He heard Pimental say, " 'Well, here we go, Joe' and I looked to see what it was and when I came to I was in the County General Hospital, I was told." Appellant Esau testified that in his opinion he had been going south on Madera Avenue at between 30 and 35 miles per hour. When he was 390 or 400 feet from the intersection with McKinley Avenue he reduced his speed. This he did by releasing the gas pedal a little but he continued to keep his foot on the pedal with enough pressure to keep his car rolling south. He thinks he was going at about 25 miles per hour when he got to the intersection. He first said on the stand that he saw the Pimental car just as he himself got to the intersection. It was then a little way beyond the stop-sign to the east and had not yet come to Madera

Avenue. He thinks it was going at from 40 to 45 miles per hour. As Esau approached McKinley Avenue he says that he first looked to the right where the view was obstructed by some sweat boxes. Asked on examination under section 2055, Code of Civil Procedure "Then you didn't look to the left until you came to the intersection, is that right?" he answered "yes". Later he testified that it was "just before I entered the intersection". In a deposition he had said "just when I got to the intersection, why, I noticed the car coming from the east". By "intersection", however, he explained that he meant the area indicated by the fence lines on McKinley Avenue and Madera Avenue respectively. He finally indicated that the place which he had reached when he first saw the Pimental car was 10 or 15 feet north of the intersection. He testified that the area to his left was occupied by high grape vines. When he saw the Pimental car he started to set his brakes but they didn't have time to take effect before the collision occurred. He did not alter the direction of his car but went straight on.

When the Pimental car came to rest after the collision it stood against a power pole southwest of the intersection in such a position that its left side just back of the driver's seat was broken and caved in by impact with the pole. The right side of the cab and adjacent parts of the "pickup" were completely wrecked, as was the right fender. The marks on the pavement apparently indicated that the "pickup" had been carried sidewise something like 18 inches, after which they stopped, though linear marks led in the direction of the power pole and it is claimed that they indicate the continued course of the Chevrolet in that direction. Pimental claims that the "pickup" fell over on the Chevrolet, that its wheels were lifted off the ground and that it was carried along in that position by the Chevrolet until it was stopped by the power pole and deposited against the latter. The "pickup" when it came to rest against the power pole was headed northwest. The Chevrolet when it came to rest had been turned around and was off the Madera Avenue pavement on the west side facing northeast with its back about 5 feet from the "pickup". The entire front of the Chevrolet was wrecked, though Esau thought the damage greater on the right side.

We are unable to follow counsel for appellant Esau in his contention that Pimental's testimony is too contradic-

tory to admit of any reliance being placed upon it. It was a question for the jury whether such inconsistencies as it does exhibit were greater than might be expected from a witness called on to repeat several times in minute detail his recollection of occurrences that occupied but a few moments of time.

■ It cannot be said as a matter of law that Esau was not negligent. It is true that he was driving on a "through highway" and had the right, so long as he was making proper use of his own powers of observation, to assume until there was some indication to the contrary that others likely to come within his path would act with ordinary care and observe the traffic laws. The circumstance that a driver is using a through highway, however, does not absolve him from making ordinary use of his faculties. The jury had the right to believe from Esau's own account that he was unduly slow in looking to the left and if it believed Pimental's testimony on that point it may have reasonably concluded that Esau was oblivious to anything on that side of the course that he was following until practically the moment of the impact itself. We think the evidence sufficient to sustain the verdict against him.

■ Among the instructions given by the trial court was the following:

"You are instructed that it is a part of the duty of the operator of a motor vehicle to keep his machine always under control so as to avoid collision with other cars and other persons using the highways. He has no right to assume that the road is clear, but under all circumstances and at all times he must be vigilant and must anticipate and expect the presence of others."

Objection is made to this instruction on two grounds:

(a) It is claimed that it amounted to telling the jury that one rightfully driving upon a highway must under all circumstances anticipate that others will negligently and unlawfully drive upon it. We do not think that this instruction read as a whole carries that meaning. It is only while using due care himself that one may lawfully assume that others will obey the law and refrain from negligent acts that may endanger him. As said in *Commonwealth Ins. Co.* v. *Riverside-Portland Cement Co.*, 69 Cal. App. 165, 168 [230 Pac. 995], "while he may assume that others will exercise due care, he cannot for that reason omit any of the care which the law demands of him". No driver is at any time excusable

for want of vigilance or failure to observe what may be plainly seen and the last sentence of the instruction quoted, which is the portion against which this criticism is directed, goes no further than to state that proposition.

(b) A more plausible contention is that the instruction complained of was tantamount to telling the jury that a driver on a public highway must *"at all times and under all circumstances avoid a collision of his car with another"*, or, in other words, that every driver who has been involved in a collision must necessarily have been negligent. The criticism is directed particularly to the first sentence of the instruction. That the trial court could have intended it to have the effect suggested is, of course, impossible. Manifestly, in saying that it was ''part of the duty of the operator of a motor vehicle to keep his machine always under control *so as* to avoid collisions with other cars and other persons using the highways'', the court intended the instruction as merely another way of saying that it is the duty of such operator to keep his machine always under control *with the purpose* of avoiding collisions with other cars and other persons using the highways. Instructions, indeed, in substantially identical language have been frequently given. Thus in *Meyers* v. *Bradford,* 54 Cal. App. 157, 158 [201 Pac. 471], the court instructed the jury *inter alia* that ''it is part of the duty of the operator of a motor vehicle to keep his machine always under control *so as* to avoid collisions with pedestrians and other persons using the highway. He has no right to assume that the road is clear but under all circumstances and at all times he must be vigilant and must anticipate and expect the presence of others''. In affirming the judgment, the appellate court said: ''That said instruction demands the proper *attitude* of an operator in the situation referred to can hardly admit of a doubt.'' In the instant case it is entirely clear that the proper construction of the language under consideration is that it is descriptive of the *attitude* which the law expects the driver of a motor vehicle to have, that is, the effort he is required to make to avoid collisions, and that it is not at all intended to suggest or state that he is always or necessarily responsible for results. While in its literal construction the language used in this instruction may be in some sort ambiguous, all the instructions given must, of course, be read together and the jury here was instructed that: ''One

who is himself exercising ordinary care has a right to assume, until the contrary becomes apparent, that all other persons using the street will obey the law and use ordinary care for their own safety''. It is claimed, indeed, that the instruction complained of and the one last quoted, which latter is admittedly correct, are in conflict with each other, but we think the fact to be that the latter serves rather to make clear the proper construction of the former and that when the former is given the construction thus indicated the two are in entire harmony.

■ It is next claimed that the trial court in effect instructed the jury that it might find that driving a truck into a blind intersection of a through highway from an intersecting road without stopping was in accordance with the law and the act of a prudent man. The language complained of followed that which we have last quoted and was to the effect that:

"In this case defendant, N. L. Pimental, so long as he was using ordinary care, had a right to assume that all persons using the highway, including the defendant Esau, would obey the law and use ordinary care for their own safety.''

We do not think the effect of this language to have been that which appellant's counsel ascribes to it. The use of the expression "so long as he was using ordinary care", in view of the connection, manifestly meant merely "if and while" he was using ordinary care. While it seems tolerably clear that Pimental did not come to a full stop before entering the intersection, the instruction by its terms excludes his right to rely on the care of others while thus negligent himself. Whether his failure to stop proximately contributed to the accident or whether, contrariwise, he had so slowed down as to amount in practical effect to the same thing as a stop, were questions for the jury. Though he were negligent in failing to stop it would not necessarily follow that the effect of such negligence continued to influence his position or action as he actually entered the intersection. By reading section 577 of the Vehicle Code, as in force when the accident occurred, the court fully informed the jury of Pimental's duty to make such stop. ■ Moreover, as respects any claim that the instruction complained of tended to exonerate Pimental from responsibility the complete answer is that, if such had been its tendency, such tendency was harmless, inasmuch as the

jury included Pimental as well as his employer Bragg among those against whom it rendered its verdict. Further complaint, however, is made that while the instruction complained of is one-sided, inasmuch as it tended to exonerate Pimental, it omitted reciprocally to give Esau the benefit of the same doctrine. This complaint, however, appears to overlook the circumstance that the instruction went on in the language following, to wit:

"If you should find from the evidence in this case that said Henry Esau immediately prior to and at the time of the said accident, was conducting himself while in the operation of his automobile in the same manner that any other person of ordinary care and prudence, acting under like circumstances, would have conducted himself, then said defendant was not guilty of negligence and plaintiff is not entitled to recover against Henry Esau and your verdict must be for the defendant Henry Esau."

We think that the practical effect of the last quoted language, when considered with that which preceded it, was to inform the jury that the rule was the same as to both drivers, that is, that each driver if using due care himself was entitled, while doing so, to assume that the other would use it.

■ It is further asserted that Pimental was shown by the evidence to have been negligent as a matter of law and we infer that the suggestion in that connection is that the court should have so instructed the jury. While we do not think that the court was called upon to go that far, a conclusive answer to this suggestion is, again, that the jury found him negligent as a matter of fact and that, therefore, no complaint on that score on the part of Esau would appear to be in order.

■ It is also said that it was error for the court not to instruct the jury that Pimental was obliged to enter the intersection at 15 miles or less per hour. One answer to that would appear to be that if Esau wished such an instruction he should have asked for it.

■ It is finally claimed that the damages awarded were excessive. Angelo was, beyond doubt, gravely injured. According to the medical testimony "he had a fracture of the pubic bone, both the superior and the inferior rami". He had two ribs broken. Dr. Drake, to whom he was first taken, testified that he had a severe bruise on the left side of the head and a deep cut four inches long and a hemorrhage

from the left ear. Angelo complained of the soreness of the head on the left side. He was confined to his bed from the day of the accident, October 22, 1936, until November 26th of that year, after which he was allowed to walk a little each day. He was finally discharged on January 31, 1937, as able to work again. Dr. Ehlers, who attended him and had known him about 15 years theretofore, testified that though X-rays were taken they disclosed no fracture of the skull. In his opinion, so far as the injuries to the pelvis and ribs were concerned, Angelo appeared to have made a good recovery. "His pelvis did not seem to be tipped and there was no muscular deterioration that I could find." Dr. Ehlers has, however, more lately observed that for some months past Angelo has walked with a limp. He says that there is no shortening of either leg. One Smith, who says that he worked with Angelo in 1922 or 1923 at Fowler, described him as having had an epileptic seizure at that time and as having admitted carrying around with him in his automobile a water bottle and saying that when he felt such seizures coming on if he got water soon enough it would help him. Bragg, his employer, testified that in the fall of 1936 (evidently before the accident):

"We was in the back of the store. Mr. Pimental was doing something or other. I was back there talking. Mr. Angelo was also along. All at once I noticed Mr. Angelo commencing to get white and he kind of stiffened, his eyes kind of got glassy. I asked Mr. Pimental what was the matter with him. He said to leave him alone, that he was having one of his spells. That is the first time I had ever seen it so I didn't know what it was."

One Migill, an employee of a telephone company, said that three or four years before the trial Angelo had collided in an automobile with one of the company's poles; that the witness went upon the scene and spoke to Angelo, who apparently did not recognize him but was very pale and looked as though something had happened to him. Angelo, he said, finally drew off and drove away. Dr. Ehlers, when asked a hypothetical question based on the observations testified to by Smith, said that the conduct recited would in his opinion indicate epilepsy. Dr. Harold F. Downing, who examined Angelo before the trial, testified that at that time he was very slow and it was difficult to get a definite accurate his-

tory from him because of his faulty memory and that he gave the impression of being dazed and spoke as though his tongue were not under control. The circumference of his right thigh was three-quarters of an inch less than that of his left thigh; the reflexes of his right leg were not as active as those of his left; in bending over and picking up objects he did so awkwardly; he couldn't see that there was any disfunction of the pelvis. Dr. Downing testified that an ear hemorrhage resulting from an injury is usually considered to indicate a skull fracture toward the basal portion. He thinks that if Angelo suffered in the accident a blow on the head it might naturally have caused a bruise to the brain from which he did not fully recover and that this may account for his present mental condition. Various acquaintances testified that they had never noticed about Angelo any epileptic symptoms. Dr. Mitchell also examined Angelo prior to the trial and attributed his mental condition to ''an injury to the higher nerve centers principally'' and thought the condition permanent. He noticed no symptoms of epilepsy.

When we look at the situation as a whole, it appears to us that there is evidence from which the jury and the trial court could reasonably have concluded that, regardless of any condition of epilepsy from which Angelo might before the accident have suffered and may still suffer, he sustained injuries to his damage in the amount awarded.

The judgment is affirmed.

Barnard, P. J., and Griffin, J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 16, 1939.