## BULLOCK v. LUKE et al.

No. 6122.    Decided January 22, 1940.    (98 P. 2d 350.)

Rehearing Denied, June 5, 1940.

502

*Arthur E. Moreton,* of Salt Lake City, for appellants.

*Rex J. Hanson* and *E. LeRoy Shields,* both of Salt Lake City, for respondent.

PRATT, Justice.

Victor Bullock, on his motorcycle, and Thomas Luke, driving a truck in the course of his employment with Central Truck Lines, collided. The collision occurred at the intersection of Third West and First South Streets, in Provo, Utah. Bullock sued Luke and the truck company. He recovered judgment, and the latter two brought the case before us on appeal. We shall make no further reference to the truck company with the understanding that what is said of Luke is applicable to both defendants.

Bullock charges Luke with negligence. Luke denies this and makes an affirmative defense charging Bullock with negligence. The negligence alleged by each is practically identical. It consists of a failure to keep a proper lookout; speed in excess of 25 miles per hour; excessive speed under the circumstances; failure to yield the right of way; and a failure to keep the vehicle under proper control. Bullock makes an additional charge that Luke failed to slow down or stop.

After the testimony was introduced and the parties had rested, Luke moved for a directed verdict. He contends that the testimony shows as a matter of law that Bullock was negligent and caused the collision or contributed to its cause.

Neither street, making the intersection involved, is set off from the other by stop signs nor by a signal light. Third West runs north and south, First South runs east and west. Third West is about 42 feet wide at the south intersection line, and 54 feet wide at the north intersection line. First South is approximately 45 feet in width. The collision occurred in broad day light about 8:15 of an October morning. The impact occurred some 18 feet north of the south intersection line, and in the southeast quarter of the intersection. As one approaches First South, while traveling north on Third West, he can see 200 feet west on First South at a point 60 feet south of the south intersection line; and he can see 800 feet west on First South at a point 20 feet south of

that south intersection line. Bullock was riding north on Third West and Luke was driving east on First South.

Bullock testified upon direct examination before he had been subjected to any cross-examination, that he first saw Luke when the latter was 15 feet west of the west intersection line, and he, Bullock, was 20 feet south of the south intersection line. Later Bullock corrected this by saying that what he meant was that he was 20 feet south of the point of impact when he first saw Luke. He testified that he was riding from 20 to 25 miles per hour, and could stop in 25 feet distance. In other words, seeing Luke for the first time some 20 feet south of the impact, it was impossible for him to get stopped before the impact. Inferentially if he had seen Luke earlier he could have stopped and avoided the collision. But there was nothing to prevent his seeing Luke earlier. Back 60 feet from the south intersection line, Bullock could have seen 200 feet west on First South. At 20 feet south of that line, he could have seen 800 feet west. Why, then, didn't he see Luke before the time claimed by him? There is but one conclusion. He, Bullock, was not looking. By reason of his failure to look, he did not discover Luke until it was too late.

Before discussing the law of this case, let us assume that Bullock first saw Luke, when he, Bullock, was 20 feet south of the south intersection line; that his corrected testimony was an inadvertence. We shall make that assumption for the purpose of showing that even under such state of facts, the thought in Bullock's mind was not: "Is he (Luke) going to give me the right of way?", but was: "Can I get across first?"

On the witness stand, Bullock testified that when he saw the truck it was coming "mighty fast." The truck was 15 feet west of the west intersection line at the time. If Bullock was then 20 feet south of the south intersection line, it was questionable whether he was going to have the right of way under the ordinance involved in the case. The ordinance is quoted later in the decision. Bullock said Luke was

not looking where he was going. Luke testified that he did not see Bullock. In the light of these facts, consider the following quotations from Bullock's testimony:

"I figured in as much as I had the right of way and I was at the intersection there *I could pass him.*" (Italics added.)

"Q. And you felt you had a greater right there because you were at the right? A. Yes."

And again:

"Well, I thought I would have enough time. I knew I was on the right side of the road, and that I had the right of way."

Do we not have here an illustration of what might be termed a rather prevalent idea of drivers with the apparent right of way: That they are relieved of all caution by reason of position?

Under the ordinance in this case, and under the state law generally, when two drivers approach an intersection, the one on the right has the right of way under the following circumstances (Revised Ordinances of Provo 1937):

"* * *

"Section 880. The driver of a vehicle approaching an intersection shall yield the right of way to a vehicle which has entered the intersection; when two vehicles enter the intersection at the same time, the driver of the vehicle on the left shall yield to the driver of the vehicle on the right."

See also Sec. 57-7-31, R. S. U. 1933, and the following cases: *Bryant* v. *Bingham Stage Line,* 60 Utah 299, 208 P. 541; *Collins* v. *Liddle et ux.,* 67 Utah 242, 247 P. 476; and Blashfield Cyclopedia of Automobile Law and Practice, Permanent Edition, Vol. 2, page 143, § 993.

He who has the right of way may assume that the driver on the left will afford him that right. 21 A. L. R. 974, 992; 37 A. L. R. 493, 517; 47 A. L. R. 595. But his rights are only relative *Zochowski* v. *Zukowski,* 114 N. J. L. 437, 176 A. 364;

*Groat* v. *Walkup Drayage & Warehouse Co.,* 14 Cal. App. 2d 350, 58 P. 2d 200; 89 A. L. R. 838; and Blashfield Cyclopedia of Automobile Law and Practice, Permanent Edition, Vol. 2, page 181, § 1024.

The circumstances may be such, that by his own conduct, he who has the apparent right of way has lost the benefit of that right; or the circumstances may be such that for him to insist that this position on the right entitled him to proceed first through the intersection would be carelessness and negligence upon his part. The possessor of the right of way is not relieved of the necessity of exercising care simply because he is the driver on the right.

In the case of *Angelo* v. *Esau,* Cal. App., 93 P. 2d 205, 209, we have this statement:

"'* * * It is only while using due care himself that one may lawfully assume that others will obey the law and refrain from negligent acts that may endanger him. As said in *Commonwealth Insurance Co.* v. *Riverside-Portland Cement Co.,* 69 Cal. App. 165, 168, 230 P. 995, 996, 'while he may assume that others will exercise due care, he cannot for that reason omit any of the care which the law demands of him.' No driver is at any time excusable for want of vigilance or failure to observe what may be plainly seen and the last sentence of the instruction quoted, which is the portion against which this criticism is directed, goes no further than to state that proposition."

We have recognized a similar principle, though not in an intersection case, in our recent decision of *Farrell* v. *Cameron,* 98 Utah 68, 94 P. 2d 1068.

Thus, under ordinary circumstances, when Bullock and Luke approached and entered the intersection, if Bullock had the right of way it presupposes that he saw Luke approaching. If Bullock did not see Luke under circumstances where he should have seen him, he was careless; and if as a result of such carelessness, either alone or in conjunction with carelessness on the part of Luke, a collision between them occurred, then it does not lie in the mouth of Bullock to assert that he assumed Luke would give

him that right. His own carelessness is inconsistent with such an assumption. This principle, we believe, is decisive of the facts of this case under Bullock's testimony that he did not see Luke until he, Bullock, was some 20 feet south of the point of impact—five feet short of the distance within which he could have stopped at the rate of speed he was traveling.

The question may arise: When should Bullock have seen Luke to have avoided the characterization of being negligent? In Blashfield, Vol. 2, Permanent Edition, Cyclopedia of Automobile Law and Practice, page 230, § 1038, this statement is found:

"There is no arbitrary rule as to the time and place of looking for vehicles on an intersecting road, and no particular distance from the intersection is prescribed for that purpose. The general standards are that observation should be made at the first opportunity and at a point where observation will be reasonably efficient for, and conduce to, protection."

We do not have to determine any given point. It is sufficient if under all the circumstances we can properly say that Bullock's failure to see Luke was, as a matter of law, negligence. When we consider that the view west on First South was unobstructed for a distance of 200 to 800 feet, varying with a position from 20 to 60 feet south of the south intersection line of Third West, and that through all that distance, and even farther, Bullock failed to see Luke, we believe reasonable minds cannot differ as to negligence on the part of Bullock.

We assumed another state of facts arising out of Bullock's first testimony that he saw Luke when he, Bullock, was 20 feet south of the intersection. As to that state of facts, we believe this principle applicable: For Bullock to insist upon a right of way was carelessness on his part. We say that for this reason: Ordinarily the driver on the right may presume that the one on the left will afford him the right of way; and that presumption will remain with him until such time as a reasonably prudent person will re-

alize that the driver on the left—Luke in this case—is not going to afford him that right. But here, according to Bullock, Luke, when first seen, was going "mighty fast". Bullock at that time had not actually established his right of way as he was not in the intersection. Any presumption that Luke was going to afford him the right of way was not in the picture. Luke's truck was 15 feet from the intersection line, Bullock's motorcycle was 20 feet from the intersection line, the truck was a 2½ ton truck going "mighty fast", the motorcycle was traveling at such a speed, according to Bullock's testimony, that it could be stopped in 25 feet—under such facts, to assume that Luke was going to afford Bullock the right of way was carelessness, not to say foolish. As some evidence of the fact that such an assumption would have been erroneous, we have the fact that Luke admittedly did not see Bullock, and Bullock's testimony that Luke was not looking or watching what he was doing.

However, as stated above, we are of the opinion that Bullock's thoughts at the time, if on what was about to occur, were not upon the question of whether or not Luke was going to afford him the right of way, but the question of getting across the intersection first. It may be that these thoughts arose out of a late discovery of Luke's approach from the left, and border upon an exercise of judgment to extricate himself from a dangerous situation into which his carelessness had led him. There is some support for this in the testimony given by a young girl indicative of the fact that Bullock was speeding. If this is the fact—then his thought of trying to get across the intersection first certainly would not relieve him from responsibility for results.

We are of the opinion that the motion for a directed verdict should have been granted.

The judgment of the lower court is set aside and the case remanded with directions that the lower court enter judgment of no cause of action.

Costs to appellants.

MOFFAT, C. J., and LARSON and McDONOUGH, JJ., concur.

WOLFE, Justice (concurring).

I concur in the conclusion that the evidence shows that in law Bullock was negligent.

The duty to look before entering an intersection is directly related to the speed with which one intends to traverse the intersection. The greater the speed intended the earlier one must size up the situation to determine whether that speed may be used. It was the failure to maintain this relationship which constituted Bullock's negligence, granted that entering an intersection at 25 miles an hour was not itself negligence. To traverse an intersection which is 45 feet wide at such speed that one cannot stop within 25 feet means that the vehicle would go more than half the width before the driver could stop it. Certainly it would be incumbent upon him to be quite sure that nothing might reach a point on his pathway at the same time he did where he had so little control of his vehicle as to be unable to stop in less than 25 feet. And the evidence shows that not only was he not sure that another would not be in his way but that he never looked in time to determine how he should regulate his speed. Such driving through intersections is a constant occurrence. The law should pronounce it indisputably negligent.

Absent any restrictions as to speed of entry and traverse set up by ordinance, a rough formula of care would be: Where there is any likelihood that two cars may reach the same point at the same time if either car proceeds at the speed it is going when the other driver sees or should see it, the driver of each car should so regulate his speed that he may easily stop within the distance between the point of observation and the point where their paths will cross. If all persons traversing intersections would observe this rule there would be fewer intersection collisions. Standing solely on one's supposed right-of-way where that may, under the rule giving it to him who first enters, depend on a matter

of inches, does not absolve from negligence the person who (it may turn out after the event) actually possessed it, if he failed to use the care which the traffic conditions imposed upon him. But great care should be used to distinguish those cases where one's negligence actually converged with another's in producing the accident and those cases where it is attempted to measure the negligence of one by his failure to avert the consequences of the other person's negligence. Such latter case is *Farrell* v. *Cameron*, 98 Utah 68, 94 P. 2d 1068. Another illustration would be where one enters the intersection definitely with the right-of-way and with due care in relation to *any other also exercising due care* and assumes his right-of-way to his injury. He should be allowed to recover.

In this case Bullock was driving per se negligently; that is, in relation to another exercising due care. His driving would have been negligent if Luke had been nowhere near, although it might then have resulted in no harm. But had he been driving carefully as measured by his traffic relationship to another also driving with care, he should not then have visited upon him the results of a collision on the theory that it was not only his duty to drive with care in relationship to another's driving with care but to drive in such fashion as to avoid the result of the other's negligence, especially where that negligence might be termed dynamic in character. In the dissenting opinion of *Hansen* v. *Clyde*, 89 Utah 31, 45, 56 P. 2d 1366 at page 1372, 104 A. L. R. 943, attention was called to the difference between that type of negligence where one sets the stage onto which another walks, as pointed out in the fifth, sixth and seventh categories of the situations there set out, and other types of negligence where the situation rapidly changes. While one must exercise that degree of care which the situation dictates even though the situation has a negligence factor in it created by another, we must be careful not to stretch contributory negligence to the point where we make it incumbent upon one not only to drive carefully himself but to drive so carefully

as always to be prepared for some sudden burst of negligence of another and be able to avoid it. See *Dalley* v. *Mid-Western Dairy Products Co. et al.*, 80 Utah 331, 15 P. 2d 309. The duty of A to avoid the negligence of B should only begin where that negligence was or should have been timely apparent to A, and apparent that it would in all probability continue, and A then failed to use such care as a prudent man would have used in like circumstances to avoid it. In *Farrel* v. *Cameron*, supra, and I think somewhat in *Dalley* v. *Mid-Western Dairy Products Co.*, supra, we went quite far in placing upon one party the duty to avoid the consequences of another's negligence under circumstances where I doubt whether that duty had come into being.

But in this case we are not so doing. The difference in principle in this case and in those cited is momentous and profound. This ruling encourages both drivers to be careful; the other teaches the careless fellow that he can require one in a traffic relationship with him to exercise so great carefulness as to avert the effects of his own carelessness, and penalizes the careful one for not doing so.